24-13-60 Martha D. England et al. v. DENSO Intl America Inc. et al. Oral argument not to exceed 15 minutes per side. Mr. Secunda for the Plaintiff's Appellant's. Good morning. Good morning, your honors. And may it please the court, my name is Paul Secunda. I'm here on behalf of the appellants and I'm sure you're all excited as I am to discuss ERISA. Your honors, this case is about a statement that Chief Judge Sutton made not too long ago in a case called Foreman v. Tri-Health Inc. in 2022. He said, quote, in assessing the prudence of a plan administrator's decision-making process, context often is destiny. Context often is destiny. Appellants, based on this principle, have alleged sufficient facts from which the district court should have plausibly inferred that the appellees paid what we call record-keeping and administrative or RKA fees that were excessive relative to the services rendered. Can I just come down to whether or not you've nudged over the line here to be plausible? Correct, your honor. You didn't rely upon an industry publication. You simply said there's 15 companies, big, small, whatever, and here's what they charge. So the question is, is that enough for plausibility? We did not rely upon an industry publication, your honor, but we did rely on planned documents in paragraphs. You relied on these forms, the 5,500 whatever they are, that you pulled out of wherever you get these things that, for example, are companies. We did more than that, your honor. We also relied on section 404A5 required fee disclosures, which are what the companies provide to their participants to explain the types of record-keeping and administrative services they're going to receive. You don't say specifically what anybody's charging for these fees. You just say, here's a whole menu, and they're fungible, and you've got that other word that I've already forgotten, compartmentalization or whatever it is, and that's enough. So that's what we're trying to decide. Is that enough? Yeah, your honor. So there has been a debate in the courts. There's a majority kind of view, and there's a minority view. The majority view is in what is called Hughes 2, which is the Seventh Circuit opinion, Mater, which is the Third Circuit opinion, Perkins, which is the Fifth Circuit opinion, and Davis, which is in the Eighth Circuit opinion. All those courts say that it is not necessary to kind of individually look at service by service and determine whether there's an exact match. On the other hand, more recently, the Second Circuit in the Singh case has decided that you need to talk about specific services. Most courts think that that's unnecessary, including the concurrence in Singh, which found that that actually applies a heightened pleading standard in this type of situation. That as long as you have non-conclusory facts, which is what we believe we have here with regard to the fungibility and commoditization of these types of record-keeping fees, and we believe we do, consistent with the majority view that has been espoused by at least five circuit courts in the last year, your honor. So going from there, let me... One more question. Why is this such a great mystery about what exactly these fees are and how those fees relate to what the charges are? Is that information just simply not available to plaintiff's attorneys? Your honor, in paragraph 49, we seek to unveil the mystery by listing in detail the actual services that are provided, A through J, on paragraph 49 of the Second Amended Complaint. And we explain that what is put out in the 5500 forms are direct compensation, but actually in the section 404A5 forms, which we also rely on, they actually have a combination of both direct and so-called indirect compensation, which is the revenue sharing, which is also paid to the record keeper. So I don't believe actually there's any mystery here, your honor. I think it's very clear to anyone in the industry, as we've alleged, that this is the way it works for very large plans like this one, where you have over $1.4 billion in assets and you have over 12,000 participants. Would I be right that if this case proceeds ahead, that the next step is discovery, where you ask, this is what you paid, what exactly were the services that you got? In part, your honor, there would be two phases. There would be, in my mind, the liability phase, where we would actually get direct evidence of the process, because this is a process-driven statute. Our argument is that the process here was imprudent, and that breached the fiduciary duty of prudence under ERISA. Secondly, when it goes to the harm, we would then want to make a comparison between what this plan paid and what suitable, similarly situated comparators played, take that difference, and then look at that for the class period. You're right that it's part of, in my mind, trying to figure out what the harm is, but really what the emphasis becomes in these cases when you get to discovery, and I've done dozens of them, is it's really focused on the process. I sit down with the committee members from the fiduciary committees, and I say to them, tell me about how you made this decision. How did you decide that this is what you wanted to do? And then, based on what they say, I either say, oh, well, you did what you were supposed to do, or, wow, that's problematic. And just so you know, Your Honor, one of the things that has been discussed in these cases is the expense of discovery, right? That we need to weed out meritless complaints, goats and sheep, you've probably seen all that language. But I'll tell you this, in well-run cases, discovery in these cases can be very limited, and really the limitation is see the plan documents, talk to the plan committee members, and determine whether or not the fiduciary process is reasonable, and that's what we're asking for the ability to do in this case. But the only reason that it's unreasonable is, had they done what you say they should have done, it would have resulted in a savings to the plan and its participants, right? Well, correct, Your Honor. So at some point, you then have to compare what you learned about Company A with Company B, and how do you get the information then from Company B? You can't get that in discovery from Company A. Your Honor, through a fairly long practice doing this, that is doing due diligence in many different cases, at this point over five dozen, I have, along with my consultants, a fairly robust database, which actually does provide that information. So I know, by the way, when a plan has more than 10,000 participants, and by the way, one of the things that we've alleged here is participants is really what drives the price here, not the assets. I know what you said. Yeah. So to us, Your Honor, we believe that we do have the numbers ready to go and would be willing to show a significant loss here in the millions of dollars. Thank you. You're welcome, Your Honor. You know, because context often is destiny, the court in Smith held that a plaintiff, and this is a quote, must allege that the record-keeping fees were excessive relative to the service rendered to give the kind of context that could move a claim from possibility to plausibility. And the context necessary to this court in Smith included allegations that the service that appellees' fees cover are equivalent to those that are provided by comparator plans. And the essence of our argument today, Your Honors, is that the appellants here have provided voluminous allegations, some 32 paragraphs, that the Denso plan received the same standard or equivalent bundled RKA services as 15 other plans. And as the vast majority of the other circuits and district courts have included, bundled RKA services are fungible commodities because record-keepers offer the same bundles and combinations of services as their competitors. And you can find that in paragraph 63 of our second amended complaint. Allegations of fungibility are supported by 32 separate allegations in the second amended complaint based on industry practice and plan documents. And we've also noted, of course, the four circuit court cases in the last year or so from four different circuits and dozens of district court cases, including three here. Most recently, Your Honors, in Dukes v. Amerisource, Judge Hale in the Western District of Kentucky allowed almost a materially similar case, I was going to say almost identical case, to go to discovery, on the way finding that there were non-conclusory allegations of fungibility and commoditization. There's also, prior to this, the cases of Peck, which is in the Western District of Michigan, and also the case of Moore, which was also in the Western District of Kentucky. So fungibility and commodity allegations concerning the equivalent nature of the services provided by the DENSO and 15 comparator plans are not not conclusory allegations. That's what the district court said here. Crutchin v. Rico, which is a third circuit case just from last year, July of 2024, said, Contrary to defendants' claims, the complaints allegations that the RKA service market is commodified and competitive are not mere conclusions that we must reject. We follow several courts in concluding that it is a well-pledged allegation that must be taken as true at this stage of the case. While defendants contend that there are varying types of RKA services and the charges logically diverge, this is a factual claim that must be determined at a later stage in the case. And they're citing there to the Braden case from the Eighth Circuit, to the Mader case in the Third Circuit, and to Hughes II from the Seventh Circuit. Your Honors, Would you speak to whether we're bound by Singh to decide this case? By Singh, Your Honor? Yes. Singh, S-I-N-G-H. Singh is the Second Circuit. Yes. I think I'm talking about Sutton's case, maybe I missed.  Smith, yes. Yes, that's okay. Thank you for correcting that. That's okay, and I appreciate the clarification. Your Honor, Smith is the case that sets the pleading standard, right? Smith says that you have to show that the fees in question were excessive relative to the service rendered. That is the pleading standard. There is no dispute there. The issue is the application of that pleading standard. My friend on the other side says you can just look at Smith and say, you know, it doesn't allow the complaint to go forward. You can't allow the complaint to go forward here. But context is destiny, or context often is destiny, to quote Chief Judge Sutton. And so here we have an application of Smith that is different. In Smith, they used industry averages. We don't use industry averages. We use 15 separate comparators. In Smith, they use smaller plans. Here we use 15 plans that are within a range of .1% in the universe of 401K plans for our 15 comparators. In fact, I will tell you this. Both Hughes II and Maeder have discussed Smith and what it holds and what it doesn't hold. And so, for instance, what Hughes II holds, and this is the Seventh Circuit looking at the Smith case. And again, this is just persuasive. This is not binding. But as the court recently said in Parker v. Tenneco, this is still something that, you know, the court should be interested in learning about. And it says this. It says, unlike Albert v. Oshkosh, which was another Seventh Circuit case, plaintiffs here assert there are numerous record keepers in the market who are equally capable of providing a high level of service to large defined contribution plans like the plan there. So plaintiffs maintain that the quality or type of record keeping services provided by comparator providers are comparable to that provided by the record keepers in that case, Fidelity and TIAA. Plaintiffs also plead that because record keeping services are commoditized, record keepers primarily differentiate themselves based on price and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the plans. In short, plaintiffs allege that record keeping services are fungible and that the market for them is highly competitive. Plaintiffs also contend that $35 per participant was a reasonable record keeping fee based on the services provided by existing record keepers and the plan's features. So then, I'm getting to my point, unlike the plaintiffs in what they call common spirit, we call Smith, plaintiffs plead that the fees were excessive relative to the record keeping services rendered. In other words, the other courts that I've mentioned, Hughes II, Mater, Crutchin, Perkins, they've all looked at the standard that Smith has set up, have applied the facts that are almost identical to the facts that we've alleged in this case and have found that there is a plausible claim that should be able to go forward to discovery. All right, counsel, you're out of time. You can use your three minutes rebuttal now or you can stay. I think I have two minutes, Your Honor, and I will sit down and listen to my friend. Very good. Thank you. Good morning. Good morning, Your Honors. I'm Renee Thorne and I represent the appellees. I'm trying to figure out where to start based on what my friend on the other side says and I can't resist. We all agree that from this wonderful quote, context is destiny in these cases, but to say what all plans do and what all plans with the services that they select, this is conjecture, not context, and that's exactly what they're trying to do here. Another thing I'd like to address is that my friend on the other side points out that in their complaint, they refer to the 404A disclosures. These are disclosures that the law requires that participants receive. In this particular case, those disclosures would have been given to the participants but were also turned over to my friend on the other side before the amended complaint. Those disclosures tell the participants exactly what they paid in record keeping. Despite having those disclosures, they resort to the 5500s, and while it's true they mention the 404A disclosures, there's no citation in the complaint to anything from the 404A disclosures, and we know that their comparator chart at paragraph 103 of the complaint is based solely on the form 5500s because that's what they tell us in the complaint. Having said that, in their opening brief, the appellants... Can we back up just one minute? You're saying that the other side has these 404A disclosures? They do, Your Honor, and they are referenced in the complaint. But there's nothing about them, there's no data from them in the complaint. Kind of call that under pleading, is how I think of that. Are these 404As available for other companies too or only to the participants of a particular company? The law requires simply, of course, that we give the 404A to our participants. How they get shared around after that, I can't answer, but I would observe this. Over 350 of these similar complaints have been filed in this country in the last four to five years. And in all of those cases, plans of the size of the Denso plan, these mega or jumbo plans, for the most part have been the subject of those lawsuits. And in those 350 lawsuits, the record-keeping was revealed of many other mega and jumbo plans. So the information deficit that's spoken about in the complaint I don't think exists here at all, and I think my friend on the other side has just suggested that he has created a database. Although interestingly, none of those other companies that were sued for having paid allegedly too high fees show up as comparators, even though they're using the same comparators in this complaint as in other complaints. But I digress. I just want to get back to talking about these conclusory allegations. Conclusory allegations about what all record-keepers pay and the services that all plans select do not equate to the required context that the Supreme Court in Hughes and Dudenhofer told us we have to have in every complaint. They say that we have to have a careful, context-sensitive scrutiny of a complaint's allegations, and importantly, that the duty of prudence turns on the circumstances prevailing at the time of the fiduciary's acts. Nothing in Hughes 1, the Supreme Court case, suggests that a plaintiff can leapfrog over the context requirement with generic allegations about all plans and all record-keepers and a cost comparison to what we have here in apt comparator plans. Finding that those types of allegations would be plausible is like saying everybody speeds a little once in a while in their life, so the defendant must have been speeding. That's the nature of these allegations. They're categorical. They're conjectural. They are not contextual. So are you saying that had they pled based on your... Is it 404A? Or you can just call them participant disclosures. Okay. Had they based their allegations on the participant disclosures for this plan and compared that to participant disclosures in other plans that they got from some source someplace, that would have been sufficient? I think they also have to have, if I'm understanding Your Honor correctly, there would be a comparison of plan to plan. Well, assuming that the other participant disclosures disclosed whatever the standard is, reasonably similar services. Perhaps, Your Honor, and the only reason I'm hedging there is the participant disclosures are not required to give the details of all of the services that are received. Oh, wait. I thought that's what you said they did do. They tell them what the general services cost, the ones that are for everyone. But we have to also acknowledge that there are individual record-keeping services here, and that goes into the direct cost as well, and that's why the 5,500 or so is leading. I just wonder if you're setting up a standard that no plaintiff could ever meet. I agree. But we can point to cases where that standard was met. The cases upon which my friend on the other side relies, the Mater case, for instance. In Mater, there were very specific allegations there that are not present here, and so the Mater court was not viewing the fungibility argument and inept comparators in a vacuum. So in Mater, for instance, the plaintiffs pled the actual services that were provided to the WESCO plan. And he should be able to do that here from the participant disclosure. He should, Your Honor. The similarities of those services to their comparator plans, that the plan had switched record-keepers during the class period, and so the plaintiffs argued that was sort of a baked-in comparator fee because when they switched, they got a lower record-keeping fee. In that case, there was an uncapped asset-based fee, which the plaintiffs alleged was imprudent. There was also an allegation of no excessive revenue share being returned. There's no such allegation here. And there was detailed information in the complaint about how they calculated their numbers. We don't have that information here. Hughes 2, the case upon which the appellants rely. It seems like you're getting way beyond notice pleading, though, here. Well, those were the facts that were in Mater, Your Honor. I understand that that might have been the case of what was in Mater, but you're essentially saying because they had that information in Mater, they have to have it in every other case. Well, Your Honor, that may be true or something like that, but bare allegations of fungibility and inept, unsupported, contradicted comparators is not enough. It all depends on how we define context. This is true, Your Honor, absolutely. The Hughes 2 case, which my friend on the other side relies on so heavily, also had very distinguishing factors. That was a university case, and they're really sort of an animal unto themselves because in most of the university cases, there were two record-keepers, and the issue turned on the inefficiencies and excessive cost for having two record-keepers. That was the key issue in Hughes 2. But in Hughes 2, they also alleged that the fees were excessive relative to the specific services that were rendered in that case. They had evidence of specific other plans that had reduced fees by consolidating, by soliciting bids, and by negotiating rebates, and that fees had come down after a restructuring. So in other words, they had much more context in that case than we had here. My friend on the other side suggests that he filed, as he said, he's filed a number of these cases, several of which he lost pre-Hughes 2, and he has suggested that had those cases been filed after Hughes 2, that they would have gone another way. To be clear, I believe the record is tied right now, Your Honor. My friend on the other side has said there are numerous cases accepting the fungibility argument. There are, I believe, of his own cases, seven where it has been accepted and seven where it is not. And he'll correct me if I'm wrong. All in the district court. All in the district court. And I also want to address the comment. I take it that your two firms are just following each other around the country. We see a lot of each other, Your Honor. I will say that I do take issue with the comment that the Perkins case out of the Fifth Circuit accepted the fungibility argument. While the fungibility argument was raised in the complaint, admittedly, it is not discussed in the Perkins decision itself. Rather, in Perkins, the court noted that they had pled that they were a large plan and that large plans can leverage their size to get a better deal. But the court never addressed the fungibility argument in Perkins. So if Smith only gives us the test, and that's context-based, so that doesn't resolve this case. Why is the Second Circuit analysis better than the two or three other circuits that your friend on the other side has cited? That's easy, because I gave you those distinguishing factors from Mater and from Hughes too, and the reason Singh is more persuasive than Mater and Hughes too is because our facts line up nearly identically with Singh. So, first of all, Singh relied on common spirit, or Smith. And the chart in Singh, just like here, showed a range of record-keeping fees even among the group of the largest plans, those mega plans. And so the Second Circuit found that that range among those large plans belied any implication that cost disparity alone, without the specific context for those plans and the plan at issue, could not suggest imprudence. Also, just like our case, the Singh court found that a comparison of Deloitte's average fee, so they did an average throughout the class period just as they've done here, but then compared using that average to only one year for all of the comparative plans. That's exactly what happened here. It's exactly what happened in Singh. And the court found that that could not suggest imprudence. I'm also curious, sort of from an apples-to-oranges standpoint, there's obviously a cost and an inconvenience to re-bidding these services when you have all these participants, even though you might be able to result in some lower fee, right? So has any court ever addressed how often a duty of prudence requires you to revisit this and re-bid it? No court has said that there is a requirement of any to conduct an RFP. The plaintiff's bar would suggest that an RFP should be conducted every three to five years, but no court has ever accepted that principle. Just out of curiosity, how long have you used the same record keeper for this plan? Well, the case is quite old now, Your Honor, and so during the class period they had the same record keeper. Outside of the class period is not in the record, Your Honor, as to whether they had done one just before or just after. I do think it's interesting, however, that the plaintiff's bar often cries, again, this information deficiency, and yet they were able to allege here, without allegedly all the information they need, that no RFP had ever taken place. But to answer your question, Your Honor, no court has ever held a timeline for when an RFP needs to happen because no court has ever held that it is required. And that's because there are other methods of being able to discern what's going on in the marketplace. There's benchmarking. There are RFIs, requests for information, which are something short of a request for a proposal because, as you suggest, requests for proposals are incredibly expensive and time-consuming. So I do want to focus a little bit... So do you still have the same record keeper or you don't? I actually don't know the answer to that question, Your Honor, and I apologize. But it's been three years since sort of the end of the class period. I do want to talk about the comparators a little bit here because the court doesn't even have to decide the fungibility argument to decide this case. As the district court found, there were severe issues with the comparators that were presented in this complaint, and I just want to highlight those for you for a second. The court found that the alleged record-keeping fees in the chart, and again, this is the chart at paragraph 103, do not appear on the form 5500s, which is the document that chart 103 says it derives the information from, for seven of the 15 comparators. So half of the comparators, the data does not line up, is not present on the documents upon which they say they're relying. The plaintiffs have never responded to this argument. They didn't respond at the district court, and they didn't respond in the appellate court on that issue. The court also found that the form 5500s upon which the appellants rely show variations in services because the service codes on those form 5500s were different for all of the comparators. A fact that the appellants did not dispute at the district court or respond to until their reply brief in this case, and, of course, because it was only raised on the reply, it's not, it's waived. But even what they say undercuts their argument, and that is the service codes, the court found the service codes were different. In response on their reply, they said, oh, well, one or two of the codes are the same. But they admit that for all of the plans, there are many other codes, which means the services were different, so it's not an apples-to-apples comparison. There's a suggestion that there's only two codes and that the codes overlap. Are you saying that's, are you disputing that? I am not disputing that there are two codes and that one or both of those codes show up on some of the 5500s, but so, too, do many other codes. The answer is there are more than two codes. Correct, Your Honor. Another issue was that the court said that even if the variation in services was immaterial, as the appellant suggests, that there were other issues that the numbers didn't match up. So my friend on the other, I'm out of time, Your Honor. You can have a minute to summarize. Thank you, Your Honor. Thank you. So the issue with, you heard my friend on the other side say, that price is driven by the number of participants. But in this case, we have 12,000 participants. That's the number that's alleged in the complaint. And the average number of participants on the chart at 103 is 8,900 over 19,000. So that's 30% less and over 60% more than our plan. I will note that in the reply brief, there are some new numbers that appear. Now appellants are saying that we're 14,000 and that our assets under management are $1.8 billion. And I'm scratching my head. I'm like, well, wait, that's not what the complaint says. And I realize now they're taking numbers from 2023 for the DENSO plan and comparing them to numbers for 2018 for all the comparators. For that and all of the other reasons that the judge found that the comparators were inapt, we think you can dismiss this case or affirm the district court's opinion dismissing the case. Any further questions? Judge McKeague? Judge Larson? Thank you, Your Honor. Thank you. Two minutes for Bowen. Thank you, Your Honor. I'll hop right in. As far as the 5500 forms, Mater talked about this exact issue and said the different service codes do not undermine the plan comparisons because they apparently overlap. Each comparator plan lists record-keeping fees or record-keeping and information management, or both, just as in Mater. So moreover, at this stage, the Third Circuit said, the record does not reveal the codes' precise meanings nor whether all plans define the codes consistently. But given that all plans receive some portion of an overlapping constellation of record-keeping services, the comparisons help nudge the plaintiff's claim across the line from possible to plausible. Same to here. Hughes, too, Your Honors, it says specifically, and I quote, count three is not limited to a failure to consolidate record-keepers. The fact that there are more than two record-keepers in Hughes, too, is not dispositive. How do you address your friend on the other side's argument that you've got these different constellations of facts? One constellation is within the cases that have said it's plausible, and then we essentially have Singh saying no. And she claims that the allegations in your complaint read much more closely on the Singh allegations than in these other three or four circuits. So how do you respond to that? I respond to you, Your Honor, by reading the Singh decision, which actually discusses both Mater and Hughes in detail. And if you read how Singh discusses those cases, you will see that this complaint is exactly like Mater and Hughes as discussed by Singh. The other thing I would say, Your Honor. So you're saying that when you read on your allegations, they don't read on Singh? They don't read on them. Also, Your Honor, on Perkins, I see I'm out of time. Can I just make one more point? So on Perkins, it does talk about fungibility. Judge Edith Jones, writing for the Fifth Circuit, said the defendants contend that the record-keeping fee allegations fail to include allegations about the specific services rendered in exchange for fees. We disagree and conclude plaintiff's allegations about comparative costs and services are sufficient to survive dismissal. So I do believe that Perkins and Judge Jones accepted the same types of fungibility allegations we have in this case. Any further questions? All right. Thank you, counsel. Thank you, Your Honor. Very informative arguments. Thank you, Your Honor. The case will be submitted. You may adjourn the court.